UNITED STATES of America, Plaintiff

v.

Adrian ARMSTRONG, Defendant.

Criminal No. 04–250 (JAG).

United States District Court,
D. Puerto Rico.

May 7, 2009.

Timothy R. Henwood, United States Attorney's Office, San Juan, PR, for Plaintiff.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

Pending before this Court is Adrian Armstrong's ("Defendant") "Motion to Dismiss the Indictment and/or Exclusion/Suppression of Evidence" ("Motion to Dismiss/Suppress"). (Docket Nos. 146, 225).

For the reasons set forth below, Defendant's Motion to Dismiss/Suppress is **GRANTED** in part and **DENIED** in part.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 25, 2004, Defendant was indicted with narcotics violations under 21 U.S.C. § 952(a), 963. He was also indicted with money laundering violations under 18 U.S.C. § 1957, 2. On May 17, 2007, Defendant filed the present Motion to Dismiss/Suppress. (Docket No. 146). In it, Defendant requests the dismissal of the indictment or, in the alternative, the suppression of certain audio recordings. The audio recordings allegedly contain conversations that took place between Defendant and Alexander Young Duffis ("Young–Duffis"), a cooperating individual for the Government. During the conversations Defendant and Young–Duffis allegedly exchange information related to the commission of the crimes Defendant has been charged with. The audio recordings were identified as N–17, N–18, and N–22. Defendant alleges that the audio recordings have been tampered with by either Young–Duffis or the Government. To support his claim of tampering, Defendant submitted a report by the expert witness he retained, James A. Griffith ("Griffith"). (Docket No. 146–2). Defendant contends that the alleged tampering constitutes outrageous government misconduct in violation of his due process rights and requests the dismissal of the indictment. In the alternative, he requests that the audio tapes be suppressed. (Docket No. 146). On May 21, 2007, the Motion to Dismiss/Suppress was referred to Magistrate Judge Camille L. Vélez–Rive for a Report and Recommendation. (Docket No. 147).

Two suppression hearings were held before the Magistrate Judge. The first hearing was held on October 9, 2007. The

second was held on September 25, 2008 in relation to N–17. Only N–17 was addressed at the hearing because the Government informed it was not going to introduce N–18 into evidence since its expert witness Barry Dicket ("Dickey") found that it was not an original copy. (Docket No. 257, p. 238, n. 4). N–22 was not addressed at the hearing because no anomalies were found by the experts and the Magistrate Judge concluded it should be admissible at trial. *Id.* At the hearing, the Government called as its expert witness Dickey while the Defendant called Griffin.

On December 30, 2008, The Magistrate Judge issued her Report and Recommendation. (Docket No. 257). The Magistrate Judge recommends that Defendant's Motion to Dismiss/Suppress be granted in part and denied in part. Specifically, she recommends that Defendant's request regarding the suppression of N–17 be granted because it "contains several anomalies which make it unreliable." (Docket No. 257, p. 242). Based on the expert witnesses's testimony and reports, the Magistrate Judge identified the following anomalies: (1) N–17 is not a recording of a complete conversation but rather its segments are independently continuous (Docket No. 257, p. 240); (2) the length of a stop/start in the recording cannot be determined (Docket No. 257, p. 241); (3) the abrupt stop at the end of the recording indicates that the conversation is incomplete (Docket No. 257, pp. 241–42); (4) there is a controversy regarding whether the tape's header had been partially erased *Id.*; and, (5) the date on N–17's header (December 27, 2003) is different than that on the Government's Report of Investigation of January 8, 2004 (January 7, 2003) *Id.* The Magistrate Judge also noted that the Government had failed to present evidence pertaining to N–17's chain of custody. Additionally, the Magistrate Judge found that the Government did not present witness testimony regarding whether or not N–17 accurately reflects the conversation recorded. (Docket No. 257, p. 242). Furthermore, the Magistrate Judge recommends that the request regarding the dismissal of the entire indictment be denied because the reasons for which N–17 was found to be unreliable do not amount to the level of Government misconduct that would warrant dismissal. (Docket No. 257, p. 243).

On February 11, 2009, the Government objected to the Report and Recommendation. (Docket No. 266). The Government specifically objects to the Magistrate Judge's finding that: "the government has not presented clear and convincing evidence that tape N–17 is a true, accurate and authentic recording of the conversation, at a given time between the parties involved." (Docket No. 266, p. 2). The Government also objects that the Magistrate Judge focused only on the portions of N–17's transcript that correspond to the moments in the conversation right before and after the stop/start in the recording. The Government additionally objects to the Magistrate Judge's finding that the government had failed to present evidence regarding N–17's chain of custody. (Docket No. 266, p. 7).

On February 12, 2009, Defendant filed his Objections to the Report and Recommendation. (Docket No. 268). Defendant objects to the Magistrate Judge's refusal to recommend the dismissal of the entire indictment. He argues that, even though cases where the indictment is dismissed because of outrageous government misconduct are rare, this is such a case because it is "a unique case of blatant bad faith tampering, destruction and fabrication of evidence which was used to indict, extradite and incarcerate [him]." (Docket No 268, p. 3). Specifically, he argues: (1) that the totality of the circumstances shows that N–17 has been tampered with and that

Defendant presented credible evidence that N–17 had been intentionally tampered with (Docket No. 268, p. 10–11); (2) that the alleged tampering amounts to outrageous government misconduct (Docket No. 268, p. 17); and, (3) that Defendant will be prejudiced, even though N–17 was suppressed, because Young–Duffis may still testify regarding the content of the conversation (Docket No. 268, p. 23).

Finally, on March 9, 2009, Defendant filed a Reply to the Government's Objections. (Docket No. 275). On the same date, the Government filed its Response in Opposition to Defendant's Objections to the Report and Recommendation. (Docket No. 276). On March 17, 2009, Defendant filed a Request for Oral Argument under Rule 7.1(g) of the Local Rules. (Docket No. 277). The Government filed its response on April 3, 2009. (Docket No. 279). On the same date, this Court denied Defendant's request. (Docket No. 281). On April 13, 2009, Defendant filed a Motion for Reconsideration. (Docket No. 282). On April 20, 2009, the Government filed its opposition. (Docket No. 286). On April 21, 2009, this Court denied Defendant's Motion for Reconsideration. (Docket No. 287).

**STANDARD OF REVIEW**

■ Pursuant to Title 28, United States Code, Section 636(b)(1)(B); Fed. R.Civ. P. 72(b); and Local Rule 503; a District Court may refer dispositive motions to a United States Magistrate Judge for a Report and Recommendation. *See Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.,* 286 F.Supp.2d 144, 146 (D.P.R.2003). The adversely affected party may "contest the Magistrate Judge's report and recommendation by filing objections 'within ten days of being served' with a copy of the order." *United States of America v. Mercado Pagan,* 286 F.Supp.2d 231, 233 (D.P.R.2003) (citing 28 U.S.C. § 636(b)(1)). If objections are timely filed, the District Judge shall "make a de novo determination of those portions of the report or specified findings or recommendation to which [an] objection is made." *Rivera de Leon v. Maxon Eng'g Servs.,* 283 F.Supp.2d 550, 555 (D.P.R.2003). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," however, if the affected party fails to timely file objections, "the district court can assume that they have agreed to the magistrate's recommendation." *Alamo Rodriguez,* 286 F.Supp.2d at 146 (citing *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.1985)).

**DISCUSSION**

A. *Government's Objections*

1. *Lack of evidence*

■ The Government objects to the Magistrate Judge's finding that it "has not presented clear and convincing evidence that tape N–17 is a true, accurate and authentic recording of the conversation, at a given time between the parties involved." (Docket No. 266). The First Circuit has established that, in the case of recorded conversations, proof that the tape recording accurately reflects the conversation in question is required to establish that it is accurate, authentic and trustworthy. *See United States v. Carbone,* 798 F.2d 21, 24 (1st Cir.1986); *United States v. Rengifo,* 789 F.2d 975, 978–79 (1st Cir.1986); *United States v. Doyon,* 194 F.3d 207, 212 (1st Cir.1999).

■ Regardless of the expert witnesses's discrepancies as to certain specific technical issues, such as whether or not N–17's header had been partially erased, the totality of the circumstances point to the fact that N–17 is not an accurate reflection of the conversation in question. First and foremost, the Government's own expert witness, Dickey, concedes that N–17 is not

a recording of a complete conversation but rather that it has two segments. A first segment between {00:23–03:34} and a second segment between {03:34–07:04}. Dickey characterized the segments as being "independently continuous." (Tr. 0/25/08, Docket No. 243, pp. 18–24). In other words, the Government's expert witness was not able to affirm that N–17 is the recording of a complete conversation. Neither was he able to establish the length of the stop/start between N–17's two segments.[1] *Id.* at p. 24.

Since the Government's own expert witness is unable to establish that N–17 is the recording of a complete conversation and because it is unable to establish the amount of time between N–17's two segments, it must be concluded that the Government did not prove that the recording accurately reflects the conversation in question as required under *Carbone.*

The Government also alleges that the Magistrate Judge focused only on the portions of N–17's transcript that are right before and after the break in the recording when deciding whether N–17 is accurate authentic and trustworthy. The Government contends that the totality of the recording shows one continuous conversation. The Government contends that, "[a] review of the transcript demonstrates continuity both in thought and context by the speakers, thus placing into doubt whether or not the break in the conversation was of any substantial length." (Docket No. 22, p. 7). This Court is unpersuaded by the Government's argument. Even if it may be possible to read the transcript in a way that could lead a reasonable person to believe a single conversation was recorded,

the Government's own expert witness was unable to categorically state that N–17 is technically the recording of a single conversation. Thus, this Court finds that the Government has failed to establish that the recording is accurate, authentic and trustworthy.

### 2. *Chain of custody*

The Government further objects to the Magistrate Judge's finding that it failed to present evidence relating to N–17's chain of custody. (Docket No. 266, p. 7). According to the Government, a possible defect in the chain of custody factors into the evidence's weight rather than its admissibility. The Government is partially correct.

█ It is well established that a defect in the chain of custody factors into the weight of the evidence and not into its admissibility. *United States v. Barrow,* 448 F.3d 37, 42 (1st Cir.2006). However, chain of custody must be established in order to authenticate evidence because "authentication is a condition precedent to admissibility." *Id.* The First Circuit has said, "if the offered evidence is of the type that is not readily identifiable or is susceptible to alteration, a testimonial tracing of the chain of custody is necessary. The purpose of testimonial tracing is to render it improbable that the original item either has been exchanged with another or has been tampered with or contaminated." *United States v. Anderson,* 452 F.3d 66, 80 (1st Cir.2006) (citing *United States v. Abreu,* 952 F.2d 1458, 1467 (1st Cir.1992)). In other words, even if a possible defect in the chain of custody is to be weighed by the jury, the Government must still estab-

---

1. It is unnecessary to discuss in depth the other anomalies identified by the Magistrate Judge because this Court considers that the fact that N–17 has two segments is enough to conclude it is not accurate, authentic and trustworthy. These are: (1) the abrupt stop at the end of the recording; (2) whether or

not the tape's header had been partially erased; (3) the date on N–17's header (December 27, 2003) is different than that on the Government's Report of Investigation of January 8, 2004 (January 7, 2003). (Docket No. 257)

lish chain of custody and authenticate its evidence. In this case, the Government has not offered any evidence or testimony to establish N–17's chain of custody. It must be concluded that the Government failed to authenticate N–17, which renders it inadmissible. In sum, this Court finds that because N–17 is untrustworthy and since the Government has not authenticated it, N17 must be suppressed.

## B. Defendant's Objections

### 1. Evidence of tampering

■ Defendant objects to the Magistrate Judge's finding that he failed to present credible evidence that the recording was intentionally tampered with. (Docket No. 268, p. 11). Defendant alleges that the totality of the circumstances surrounding N–17 are enough to prove tampering. (Docket No. 268, p. 11). To establish intentional tampering he relies on Griffin's explanation of the partial erasure of N–17's header. According to Griffin, N–17's header was partially erased by someone who pressed the Record/Erase button.[2] (Tr. 9/25/08, Docket No. 243, p. 36). The Defendant posits that Young–Duffis tried to erase the header because he wanted the recording date to be the same as that of his meeting with Government agents in January 7, 2004. (Docket No. 268, p. 12). The Defendant also contends that according to the Drug Enforcement Agency ("DEA") Investigative Report for January 8, 2008 (Exhibit F), N–17 was recorded on January 7, 2004, the same date N–18 was allegedly recorded. *Id.* at 13.

Defendant also brings to the Court's attention certain facts that according to him indicate that N–17 had been tampered with. For instance, he contends that N–17 and N–18 have similarities that indicate that N–17 had been tampered with. Ac-

cording to Defendant N–17 and N–18 both: (1) are standard sized cassettes rather than micro cassettes; (2) have a printed DEA label rather than the hand-scribbled labels typical of field recordings; (3) have a maximum recording time of fifteen minutes per side, rather than the 60 or more minutes of micro cassettes; (4) are of relatively poor recording quality, consistent with copies; (5) and, lack a dial tone, dialing sound, and ringing sound after a header. (Docket No. 268, p. 10).

He also contends that the fact that Young–Duffis did not testify, even though he was in the courtroom the day of the second suppression hearing, indicates that the Government lacks confidence in its chief witness to the facts at issue. Finally, Defendant points out that the Government has not explained why N–18 was found to be a copy, why N–17's header is partially erased, why Young–Duffis did not testify at the second suppression hearing and why there is a stop/start in N–17. (Docket No. 268, p. 11).

■ It is well settled that defendants who allege tampering must present credible evidence of its occurrence. "[T]he party challenging a tape recording bears the burden of showing they are inaccurate." *United States v. Rengifo,* 789 F.2d 975, 978 (1st Cir.1986) (citing *United States v. Cortellesso,* 663 F.2d 361, 364 (1st Cir.1981)). If a party challenging the accuracy of an authenticated recording bears the burden of proof then it follows that a party alleging tampering must also bear the burden of proof.

In this case, N–17 is inadmissible because the Government was unable to establish its accuracy and Defendant was able to establish that the totality of the circumstances show its inaccuracy. However, Defendant wants this Court to con-

---

**2.** According to Dickey the partial erasure of the date on the tape's header corresponds to a malfunction of the recording device. (Tr. 9/25/08, Docket No. 243, pp. 10–13).

clude that N17 has been tampered with because N–17 was deemed inadmissible and because N–18 was voluntarily withdrawn by the Government. This Court disagrees with Defendant. The fact that a tape is inadmissible does not necessarily imply tampering. The partial erasure of N–17's header is not enough, either by itself or in combination with N–17's other anomalies, to establish it had been tampered with. Neither are the similarities N–17 has with N–18, the fact that Young–Duffis did not testify, nor the lack of explanation as to why N–18 is a copy, enough to establish that tampering took place. However puzzling the totality of the circumstances Defendant points out may be, they do not constitute credible evidence of tampering.

### 2. *Outrageous Government Misconduct*

Since this Court finds that the Defendant failed to present credible evidence of tampering, it is unnecessary to address whether any outrageous Government misconduct that could warrant dismissal of the indictment took place. This Court echoes the Magistrate Judge in concluding that, "[t]he reasons for which we find that N–17 is unreliable, as explained above, do not amount to outrageous government misconduct which was pervasive undermining the integrity of the investigation." (Docket No. 257, p. 243).

### 3. *Defendant's prejudice*

■ Defendant also objects to the Magistrate Judge's refusal to recommend the dismissal of the indictment on the basis of the prejudice that he will suffer. Defendant argues that even if N–17 is suppressed, he will be highly prejudiced because Young–Duffis may still testify regarding the content of the conversation allegedly recorded in N–17. He contends that the only way to prevent the prejudice is to dismiss the indictment. (Docket No. 268, p. 23).

■ Under the Federal Rules of Evidence, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Fed. R.Evid.1002. "The purpose of the rule is to prevent inaccuracy and fraud when attempting to prove the content of a writing [or recording]." *United States v. Holland,* 223 Fed.Appx. 891, 898 (11th Cir.2007) (citing *United States v. Ross,* 33 F.3d 1507, 1513 (11th Cir.1994)). A witness or a party may testify regarding an event he or she witnessed or experienced even when there is a writing, recording or photograph of the event. *United States v. Miller,* 248 Fed.Appx. 426, 428 (3rd Cir.2007). When a conversation has been recorded a participant in the conversation may testify regarding the content of the conversation even if the tape was itself inadmissible. *United States v. Gonzales–Benitez,* 537 F.2d 1051, 1054 (9th Cir.1976). Also, "[A] tape recording cannot be said to be the best evidence of a conversation when a party seeks to call a participant in or observer of the conversation to testify to it. In that instance, the best evidence rule has no application at all." *United States v. Bennett,* 363 F.3d 947, 953 (9th Cir.2004) (citing *United States v. Workinger,* 90 F.3d 1409, 1415 (9th Cir.1996)).

Rule 1002 of the Federal Rules of Evidence does not apply to this case and will not prevent Young–Duffis from testifying regarding the contents of the conversation allegedly recorded in N17. If Young–Duffis in fact participated in the alleged conversation, he may testify regarding what was said in its course. Therefore, Defendant's objection is meritless.

## CONCLUSION

For the reasons set forth above, this Court **ADOPTS** the Magistrate Judge's

Report and Recommendation, and accordingly, **GRANTS** in part and **DENIES** in part Defendant's Motion to Dismiss/Suppress. (Docket Nos. 146, 225). Specifically, tape recording N–17 shall be suppressed. However, Defendant's request for dismissal of the indictment is denied. IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

CAMILLE L. VELEZ–RIVE, United States Magistrate Judge.

## INTRODUCTION

On May 17, 2007, defendant Adrian Armstrong ("Armstrong") filed a "Motion to Dismiss the Indictment and/or Exclusion/Suppression of Evidence" arguing outrageous government misconduct in this case by a cooperating individual, Alexander Young Duffis ("Young Duffis"), who was under the supervision of DEA agents. Armstrong claims in his motion that Young Duffis was engaged in drug trafficking and money laundering and the evidence against defendant consists solely of the testimony of Young Duffis based on consensual recordings he allegedly made of defendant. These recordings have been identified as N–17, N–18 and N–22. Defendant makes reference to having retained an expert James A. Griffin ("Griffin") who did an analysis of the consensual recordings and concluded the tapes in question have been tampered with. Defendant requests the dismissal of the indictment or in the alternative the suppression of the evidence in question. (Docket No. 146).

On May 21, 2007, the above motion was referred to the undersigned for report and recommendation. (Docket Nos. 147 and 148).

After several procedural matters related to defendant's bail, defendant filed on July 26, 2007 a "Request for an Order Granting Defendant's Motion to Dismiss or for Exclusion/Suppression of Evidence" (Docket No. 172).[1]

On July 30, 2007, the government filed an "Opposition to Motion to Dismiss" indicating the report of its expert witness was not ready and could not file its opposition to the motion to suppress without said report. (Docket No. 173).

On October 9, 2007, the suppression hearing was held in which defendant called Griffin as his expert witness and both of his expert reports were admitted into evidence. (Exhibits A and B). The government called as its expert witness, Agent Ryan Johnson ("Johnson"), and his expert report was admitted into evidence (Exhibit 1). Counsel for the government and for defendant requested holding the hearing in abeyance so that the government could hire an expert on magnetic development, at which time the government would inform the Court of possible dates for the continuation of the hearing. Defendant informed at that time he was waiving the speedy trial. (Docket No. 198).

After several months, the government submitted a new expert report by Barry Dickey ("Dickey") dated April 21, 2008 who was retained as a forensic expert to assess the authenticity and integrity of the tapes in question.

On May 21, 2008, defendant filed a "Motion to Supplement Defendant's Motion to Dismiss or for Exclusion/Suppression of Evidence" including a supplemental report of defendant's expert Griffin submitted on March 3, 2008. (Docket No. 225).[2]

---

1. The "Motion to Dismiss" was also referred to the undersigned for report and recommendation. (Docket No. 183).

2. This supplemental Motion was also referred to the undersigned for report and recommendation. (Docket No. 229).

On June 9, 2008, the government filed its "Response to Defendant's Supplemental Motion to Dismiss" in response to Docket Nos. 146 and 225. The government informed a hearing should be held as to tape N–17. Regarding tapes N–18 and N–22, the government submitted that no hearing was needed on these two items because the government was not going to introduce N–18 into evidence [3]. In relation to N–22, the government submitted there were no anomalies found on this recording, thus, it should be admitted into evidence. (Docket No. 232).

On September 25, 2008, the further suppression hearing was held only in relation to N–17, as agreed by the parties. The government called as its next expert witness, Dickey, and his report was admitted into evidence. (Exhibit 4). The defense recalled to the witness stand expert Griffin. After hearing the testimonies presented, the Court ordered the transcript of the hearing. Once the transcript was received, the government would have ten (10) days to file its post-hearing memorandum and defendant would have ten (10) days, thereafter, to file his reply. (Docket No. 242).

On October 8, 2008, the transcript of the September 25th hearing was filed. (Docket No. 243). After requesting several extensions of time, the government filed its "Summary Opposition to Defendant's Motion to Dismiss" on November 3, 2008. The government argued the sole issue before the court is whether N–17 should be admissible at defendant's trial. The gov-

ernment moved the court to deny defendant's request to suppress N–17 based on the testimony of Dickey and his findings. (Docket No. 248).

On December 15, 2008, defendant filed his "Memorandum in Support of Motion to Dismiss and/or Exclusion/Suppression of Evidence" summarizing the proceedings, defendant's arguments and grounds for dismissal of the indictment and the suppression of N–17. (Docket No. 255).

The undersigned is now in a position to issue this report and recommendation after the parties filed their post-hearing briefs.

## SUMMARY OF EVIDENCE PRESENTED AT EVIDENTIARY HEARINGS [4]

### A. TESTIMONY OF GRIFFIN ON BEHALF OF DEFENDANT:

Griffin testified as to his conclusions and opinions regarding the consensual tapes in question explaining the process of his forensic analysis and the conclusions he reached after his examination. Regarding tape N–17, he found that there is a break in the recording after three minutes-thirty four seconds which was the result of the recorder being stopped and re-started during the original recording event creating a gap in the conversation. This stop/start could also be the result of later editing of the tape. Griffin also found that the recording in N–17 appears to end abruptly before the conversation is concluded (Tr.

---

3. Pursuant to the Dickey's expert opinion, N–18 is not an original but the result of acoustically coupled and/or electronically connected transfers facilitated through the use of multiple playback devices. N–18 contains several anomalies which question the integrity of the entire recording. The segments existing on N–18 are not consistent with event(s) and/or dialogue in a continuous and reliable manner. (Exhibits 3 and 4).

4. The only suppression issue pending before the court is the suppression of tape N–17 because the government has indicated it will not use N–18 as evidence at trial. As to N–22, there are no anomalies and, thus, it should be admissible at trial. Thus, the summary of the evidence only includes the testimony of the expert witnesses pertinent to tape N–17.

10/09/07, pp. 11 thru 13; Exhibit B–Report of March 26, 2007). He also concluded that the words "December 27, 2003" had been erased in the tape and that the erasure was done using the recorder which was submitted to him by the DEA as the recorder which was used to record the original. (Tr. 10–09–07, p. 18). He confirmed that for N–17 there is a break in the middle of the recording, likely the result of stop and start or the possibility of later editing or over recording.(See Tr. 10–09–07, pp. 16 thru 22).

## B. TESTIMONY OF JOHNSON ON BEHALF OF THE GOVERNMENT:

Johnson testified that for his forensic analysis he performed critical listening, waveform analysis, spectrographic and spectrum analysis. (Tr. 10/09/07, p. 70). Regarding tape N–17, he agreed that there was stop-start at three minutes thirty-four seconds, and that there is no way to determine the length of the stop-start. (Tr. 10–09–07, p. 72 thru 80). Johnson agreed with Griffin that tape N–17 ended abruptly after seven minutes four seconds (Tr. 10/09/07, p. 80). (Exhibit 1).

## C. TESTIMONY OF DICKEY ON BEHALF OF THE GOVERNMENT:

The following are the steps and results of the examination of exhibit N–17 performed by Dickey as summarized in his expert report. (See Exhibit 4). Evaluation of the section located at approx. {00:02} verified the low-level speech, "December 27, 2003". At approx. {00:05}, a transient is present and coincides with an increase of volume. The subsequent speech suggests the completion/continuation of the header. Further evaluation (MD) of this portion did disclose an EH similar to that of EQ–1; however, a corresponding RH could not be identified. Review of the record/erasure exemplars created by EQ–1 disclosed complete RH/EH

patterns. Comparative analysis of the depth of erasure associated with EQ–1 did not support the existence of residual speech when operating properly. To the contrary, results suggest that erasure would have adequately dispersed any existing fields. Therefore, other plausible explanations should be considered, including the possibility that the recorder did not function properly during activation or that some failure may have momentarily occurred. At approx. {00:23}, a rec/pause event is present at the end of the header and coincides with the start of conversation. At approx. {03:34}, a stop/start event occurs. The amount of time, which elapsed during deactivation, cannot be estimated. The conversation ends abruptly at approx. {07:04}. Based on the examination of N–17, Dickey opines that the recording(s) are original and were created by EQ–1 or a device of similar head configuration/electronics. N–17 contains {2} two anomalies which question its integrity as a continuous recording of a single conversation. The segments existing between {00:23—03:34} and {03:34—07:04} are independently continuous. However, the complete conversation(s) and context/subject matter is limited to the representations/dialogue present. Dickey's opinion is that there is a start/stop in the conversation on recording N–17.

## LEGAL ANALYSIS

### A. MOTION TO SUPPRESS.

 "Before a tape recording may be properly admitted at trial, Federal Rule of Evidence 901(a) requires the government to offer 'evidence sufficient to support a finding that the [tape] in question is what its proponent claims.'" *United States v. Eberhart,* 467 F.3d 659, 667 (7th Cir.2006) (quoting *United States v. Westmoreland,* 312 F.3d 302, 311 (7th Cir.2002)). The government satisfies this requirement by

offering clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties. *Id.*; *United States v. Carbone*, 798 F.2d 21 (1st Cir.1986) (the United States is to establish that the recordings are accurate, authentic and trustworthy). The government may meet this burden by offering evidence establishing the tape's chain of custody or the testimony of an eyewitness that the recording accurately reflects the conversation that he or she witnessed or evidence establishing the chain of custody. *Id.*; *United States v. Emerson*, 501 F.3d 804 (7th Cir.2007)

██ In determining whether there was a sufficient showing of accuracy to warrant admissibility, we must keep in mind the governing standard: "the possibilities of misidentification and adulteration (must) be eliminated, not absolutely, but as a matter of reasonable probability." *United States v. Haldeman*, 559 F.2d 31, 106 (D.C.Cir.1976); *Gass v. United States*, 135 U.S.App.D.C. 11, 14, 416 F.2d 767, 770 (1969).

Armstrong claims tape N–17 was edited or altered, and he called an expert (Griffin) to testify at the evidentiary hearing that there were anomalies, edits, and pauses on the N–17 tape. The Government rebutted with two experts (Johnson and Dickey) and expert Dickey testified that nothing on the tape N–17 indicated tampering. Dickey believes that it is too subjective to suggest that one start/stop in a conversation necessarily indicates that there was tampering with the recorded conversation.

Upon a careful review of all of the experts' opinions in writing and their testimonies at the evidentiary hearing, we find the government has not presented clear and convincing evidence that tape N–17 is a true, accurate and authentic recording of the conversation, at a given time, between the parties involved.

It is uncontested that all the experts agree that N–17 is not a recording of a complete conversation. In fact, expert Dickey, for the government, stated N–17 contains two anomalies which question its integrity as a continuous recording of a single conversation. The segments existing between {00:23—03:34} and {03:34—07:04} are independently continuous. In addition, Dickey testified he cannot estimate the length of the stop/start. Dickey was questioned on this matter on cross-examination by defense counsel as follows:

Q Sir, and please bear with me because I am not scientifically inclined. The truth is that, on N–17, the content you have is two fragments of a conversation or two, different conversations?

A Could you be more specific?

Q Yes. Now, you have said that, when you analyzed the tape, there is a stop/start at zero, zero point twenty-three, correct?

A. That is the start of the conversation, correct?

Q Yes, there is a stop at three, thirty-four?

A That's correct.

Q And, then it restarts and goes on to seven minutes 'o' four?

A That's correct.

Q Now, so you have either one conversation that was cut in the middle or you have two fragments ... you have two fragments of the same conversation? That could be one possibility?

A That's correct?

Q Or it could be two, different conversations? You cannot ... you don't know that?

A It cannot be verified positively, no.

Q Very well. Isn't it correct also that, at seven 'o' four, at the end of this tape, the conversation ends abruptly?

A Yes, as I stated earlier.

Q Now, so neither of those two conversations in that tape you don't know or you cannot testify to? The truth is that none of them is a complete conversation?

A You're saying "none of them." Could you restate it?

Q Well, like I said, you have one from three ... from point twenty-three to three, thirty-four. You have another one from three, thirty-four to seven 'o' four.

And you cannot state, for the record and to the Court, that those are complete conversations?

A That's correct, they're independently continuous.

Q Very well. Now, and you already stated that you cannot estimate the length of the stop/start? And, I'm repeating it because I want to be clear.

You don't know, when that tape was stopped at three point thirty-four, how long that stop was, what's the duration of that stop?

A Yeah, I cannot positively verify that. (Tr. 9/25/08, pp. 18–20).

Thus, based on the testimony of the government's own expert witness (Dickey) as above quoted, the government has not been able to establish that N–17 is the recording of a complete conversation. In fact, expert Dickey refers to the conversations as "independently continuous" so there can be more than one conversation. In addition, Dickey admitted, in relation to the stop-start during the conversation(s), that he cannot estimate the amount of time which elapsed during the period from the stopping of the tape and the amount of time that elapsed before it restarted. (Tr. 9/25/08, pp. 14–15). Thus, there is a gap in the conversation which is unaccounted for.

Similarly, Johnson (additional expert for the government) agreed that there was a stop-start at three minutes thirty-four seconds, that there is no way to determine the length of the stop-start and that it could have been done intentionally. (Tr. 10/9/07, pp. 74–78 and 110–111).

This was confirmed by defendant's expert witness Griffin who testified that there is a break in N–17 in the middle of the recording, likely the result of a stop and start or the possibility of later editing or over recording. (Tr. 10/9/07, pp. 18–19). As argued by defense counsel, the recording could be a partial recording of a single conversation or a partial recording of two different conversations.

The main disagreement among the experts is the cause of the stop-start. Griffin, on behalf of defendant, understands N–17 was edited or altered due to the anomalies, edits, and pauses on the N–17 tape. In turn Dickey, for the government, testified that nothing on the tape N–17 indicated tampering. Dickey believes that it is too subjective to suggest that one start/stop in a conversation necessarily indicates that there was tampering with the recorded conversation. Dickey indicated that there are other plausible explanations for the start/stop in the recording, such as possibility that the recorder did not function properly during activation or that some failure may have momentarily occurred.

Regardless of the cause of the stop-start, it is uncontested—as agreed upon by all the experts—that there is a gap in the conversation which length cannot be estimated. Thus, it cannot be asserted the N–17 tape is a true and accurate recording of the conversation between the parties.

Moreover, we also note that all experts agree that there is an abrupt stop at the end of the N–17 tape in the middle of a conversation while the conversation still appears to be in progress after approximately seven minutes and four seconds.

(Tr. 10/9/07, pp. 13 and 21 (Griffin) and pp. 111–112 (Johnson); Tr. 9/25/08, p. 14 (Dickey)). Thus, all experts agree the conversation is incomplete.

In addition, expert Griffin opines that the N–17 tape has a partially erased date of December 27, 2003 as a header. Expert Dickey disagrees based on his analysis. To this effect, Dickey explained that even though there was an anomaly because there was a break in the middle of the header, he concludes there was no over-recording or an intentional erasure but a malfunction in the equipment. (Tr. 9/25/08, pp. 10–13 and 23–24).

Regardless of the above discrepancy among the experts as to a possible erasure, as to the date of the recording being December 27, 2003, we note the government's Report of Investigation of January 8, 2004 (Exhibit F) indicates the conversation included in N–17 took place on January 7, 2004 and not on December 27, 2003, as the header of the tape shows. (Exhibit H-transcript of conversation). Thus, there is an inconsistency on the date of the conversation and the government has failed to provide an explanation for this discrepancy which militates against N–17's reliability.

Furthermore, the government in an attempt to meet its burden has not offered evidence establishing the tape's chain of custody or the testimony of an eyewitness that the recording accurately reflects the conversation that he or she witnessed or evidence establishing the chain of custody. *United States v. Emerson*, 501 F.3d at 804. No evidence was presented by the government at the evidentiary hearing to properly establish the chain of custody. As properly argued by defense counsel, the government chose not to present the testimony of Young–Duffis, the cooperating individual, who could have testified as to the authenticity and continuity of the conversations in question. In fact, expert

Johnson, for the government testified, that "the only person that can speak to that [start-stop] would be the confidential informant and the person on the other side of the conversation." (Tr. 10/9/07, p. 110).

Finally, the conversation in tape N–17 is in a foreign language and the government introduced as an exhibit at the evidentiary hearing a transcript of said conversation. (Exhibit H). A reading of the transcript shows that there are some gaps in the conversation or conversations in accordance with the start-stop indicated by the experts. At page 3 of Exhibit H, the CS asks twice "Ruddy" whether he knows "Roger from Ocho" and there is no answer to that question. The conversation resumes on another subject related to the payment of money in which "Ruddy" asks the CS what he wants him to do with the money. This gap in the conversation is consonant with the stop-start mentioned by the experts at 3:34 minutes which the experts agree that it is impossible to know how long the stop was.

In view of the above, the government has not met its burden of showing by clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties. Thus, under the totality of the circumstances and taking into account the testimonies of the expert witnesses, we opine that the N–17 tape recording contains several anomalies which makes it unreliable.

Accordingly, it is recommended that defendant's request that tape recording N–17 be **GRANTED** and the same be suppressed.

## B. MOTION TO DISMISS INDICTMENT.

The Supreme Court has not foreclosed the possibility that the government's active participation in a criminal venture maybe

of so shocking a nature as to violate a defendant's right to due process, notwithstanding the defendant's predisposition to commit the crime. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *see also Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113 (1976). While acknowledging the possibility that the government might in some hypothetical circumstances go too far, the First Circuit in *United States v. Panitz,* 907 F.2d 1267, 1272 (1st Cir.1990) stated that is has yet to review a situation where official conduct crossed the constitutional line; rather, an unbroken string of First Circuit cases has repulsed attempts to win dismissal of criminal charges on such a theory. *United States v. Panitz,* 907 F.2d at 1272; *see, e.g., United States v. Porter,* 764 F.2d 1, 8 (1985); *United States v. Rodriguez–Ramos,* 704 F.2d 17, 22 (1st Cir.1983); *United States v. Parisi,* 674 F.2d 126, 127 (1st Cir.1982); *United States v. Caron,* 615 F.2d 920, 921 (1st Cir.1980); *United States v. Johnson,* 565 F.2d 179, 181 (1st Cir.1977).

Other Circuits have recognized that "[w]hile there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction, the level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *United States v. Nieman,* 520 F.3d 834, 839 (8th Cir.2008).

"Whether outrageous government conduct exists 'turns upon the totality of the circumstances with no single factor controlling' and the defense 'can only be invoked in the rarest and most outrageous circumstances.'" *United States v. Haimowitz,* 725 F.2d 1561, 1577 (11th Cir. 1984) (quoting *United States v. Tobias,* 662 F.2d 381, 387 (5th Cir.1981)). "Although

federal courts possess the authority to dismiss an indictment for governmental misconduct, dismissal is an 'extreme sanction which should be infrequently utilized.' ... Dismissal is only favored in the most egregious cases." *United States v. Sims,* 845 F.2d 1564, 1569 (11th Cir.1988).

A review of the alleged government misconduct in this case for the alleged tampering by a cooperating individual of the evidence does not come close to the level of egregious unacceptability that would be necessary to implicate the Due Process Clause. The reasons for which we find that N–17 is unreliable, as explained above, do not amount to outrageous government misconduct which was pervasive undermining the integrity of the investigation. Moreover, the defense has not presented credible evidence that the recording in question N–17 was intentionally tampered with. Furthermore, defendant will not be prejudiced inasmuch as we are recommending tape N–17 be suppressed. Suppression of tainted evidence at trial is an appropriate remedy sufficient to cure any prejudice to Armstrong resulting from the admission of N–17. *See United States v. Fortna,* 796 F.2d 724, 732 (5th Cir.1986) (quoting *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)) (for the proposition that the "remedy characteristically imposed" when the government obtains evidence in violation of the Fifth or Sixth Amendment "is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongly admitted"); *United States v. Haynes,* 216 F.3d 789, 797 (9th Cir.2000).

Hence, based on the totality of circumstances, it is recommended that defendant's request for the dismissal of the Indictment, based on alleged outrageous government misconduct, be **DENIED.**

## CONCLUSION

In view of the foregoing, it is recommended that defendant's Motion to Dismiss of for Exclusion/Suppression of Evidence and related requests (Docket Nos. 146, 172 and 225) be **GRANTED IN PART AND DENIED IN PART** as follows: the request for the suppression of the N–17 recording be **GRANTED** and the N–17 tape recording be suppressed; and the request for the dismissal of the Indictment based on alleged outrageous government misconduct be **DENIED.**

### IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986). *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 991 (1st Cir.1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 30th day of December, 2008.